Argued and submitted June 30, affirmed November 19, 1986, reconsideration denied January 16, petition for review denied February 10, 1987 (302 Or 614)

STATE OF OREGON,
*Respondent,*

*v.*

CHRISTOPHER I. RECTOR,
*Appellant.*

(C-2399; CA A35725 (control))

STATE OF OREGON,
*Respondent,*

*v.*

RONALD DAVID TREMAINE,
*Appellant.*

(C-2407; A35726)
(Cases consolidated)

729 P2d 1

Diane L. Allessi, Deputy Public Defendant, Salem, argued the cause for appellants. With her on the brief was Gary D. Babcock, Public Defender, Salem.

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for respondents. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Warden, Presiding Judge, and Van Hoomissen and Young, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

This case involves an investigation conducted by several Oregon police agencies and the Walla Walla, Washington, Police Department (WWPD) that resulted in defendants' conviction for burglary. ORS 164.225. On appeal, they contend that the trial court erred in denying their joint motion to suppress evidence. There are three issues: whether Walla Walla police had probable cause to arrest defendants; whether affidavits supporting applications for two search warrants were sufficient; and whether a procedure leading to the identification of defendants was impermissibly suggestive. We affirm.

On November 23, 1983, Diane Morris, an employe of the United States National Bank in Milton-Freewater, told Oregon State Police detective Arnold that a man had come into the bank about 2:30 p.m. that afternoon attempting to exchange about $500 of rolled quarters for paper money. She described him as a white male, about 35 to 40 years old, six feet tall, approximately 250 pounds, grey and white hair, a "Fu Manchu-type" mustache and wearing thick glasses. She said that the man told her that he had tried to exchange the quarters at the First Interstate Bank in Walla Walla, which is about ten miles north of Milton-Freewater, but that that bank had refused the exchange. Morris also refused the exchange. She said that the man left the bank in a white car bearing Oregon license CKP 524 and that another man, whom she described as a white male in his thirties, was seated in the car.

Arnold contacted Ann May, an employe of the First Interstate Bank in Walla Walla. She told him that, on November 21, a man had come into that bank and had obtained paper coin wrappers. The next day, he had returned to the bank and requested the exchange of $700-$800 in quarters for paper money. He was refused. On November 23, the same man returned, again requested to exchange the quarters for paper money and was again refused. Her description of the man was similar to the one Morris had given Arnold. However, May stated that the man had a beard. She also stated that on November 23, she saw a second man, whom she described as a white male in his thirties, five feet nine inches tall, slender build with collar length brown hair.

On the night of November 23, officer McMurphy of

the Milton-Freewater Police Department (MFPD) answered an armed robbery call at Prince's Market in Milton-Freewater. The market is located in the same block as the Milton-Freewater bank. McMurphy spoke to store employes Veitenheimer and Hanford. They told him that the market had been robbed at about 9:10 p.m. that evening. They described two robbers, one of whom wore a mask over his face. The employes also said that the last car seen in the parking lot before the robbery was a brown Ford LTD. McMurphy sent a teletype about the robbery to other police agencies.[1] The teletype was received by the WWPD on November 24.

Arnold learned about the market robbery on November 25. He noticed similarities between the descriptions of the two robbers and those of the men attempting to exchange quarters earlier that day in Walla Walla and Milton-Freewater. He discussed those similarities with MFPD Detective Brown and he gave Brown the information that he had received on November 23, from Morris and May, including the description and license number of the white car. Motor Vehicles Division records showed that a white Buick, Oregon license CKP 524 was registered to defendant Rector in Prineville.

Brown learned that Rector was on probation for burglary in Crook County. He contacted Prineville officer

---

[1] The teletype said:

"ARMED ROBBERY

"AT 9:30 P.M. THIS DATE AN ARMED ROBBERY OCCURRED AT LOCAL GROCERY STORE IN OUR CITY. TWO SUSPECTS WERE IN STORE WHILE EMPLOYEES WERE CLOSING.

"SUSPECT #1 W/M LATE 40'S 5' 11" TALL, 200 LBS, DARK HAIR WITH GREY, CUT SHORT AND GREY SCRAGGLEY BEARD. WORE THICK OLDER STYLE GRAY RIM GLASSES. WEARING BLUE SPORT JACKET, LIGHT GRAY SHIRT, BLACK SLACKS AND BLACK SLIP ON SHOES. ALSO WORE GREY STRIPPED OVERALLS. WEARING TAN GLOVES.

"SUSPECT #2 - W/M 20 to 23 YOA, 5' 11" TALL 170 LBS DISHWATER BLONDE HAIR, WITH SOME CURL, NO FACIAL HAIR OBSERVED. WEARING A TAN PLASTIC MASK AND A HAT (UNKNOWN TYPE) WEARING FLANNEL JACKET RED AND BLACK IN COLOR, POSSIBLE BLUE JEANS AND BLUE NIKE TENNIS SHOES.

"SUSPECT #1 PULLED A LONG BARRELLED HANDGUN ON EMPLOYEE AND ASKED FOR MONEY. SUSPECT #1 DID ALL OF THE TALKING WHILE SUSPECT #2 STOOD BACK. LEFT IN BROWN FORD LTD, NO FURTHER DESCRIPTION ON VEHICLE."

Chance, who told him that Rector had a crime partner named Tremaine, that both Rector and Tremaine had been involved in burglary and theft in the past and that Tremaine had been known to wear a beard. Chance gave Brown descriptions of defendants from police records.[2] He also told Brown that defendants' *modus operandi* was to stay at a motel near a place that they intended to target. Perry, Rector's probation officer, told Brown that Rector owned a white Buick, and he also confirmed defendants' criminal histories.

Brown contacted the three motels in Milton-Freewater, but could not locate defendants. He then called WWPD officer Aycock and discussed with him the market robbery, the attempted coin exchanges in Walla Walla and Milton-Freewater and the MFPD teletype. Brown asked Aycock to check Walla Walla motels to determine if defendants had stayed there. He did not tell Aycock to arrest defendants. Aycock recorded the following descriptions of the robbers:

"1.   Tremaine, Ronald David, 5-17-38, 6-3, 280, Grn, Gry, Beard, Very Thick glasses. Age [*sic*].

"2.   Rector, Christopher Irving, No DOB, 5-10, 165, Brn, Blue, poss. shoulder length hair, Driver & R.O. of susp. veh. age approx. 20's, 1974 Buick 4 dr, Large white, Ore CKP 524.

"Both have extensive Burg & Theft convictions - Paroled to Prineville, Ore. Subj last known ARMED"

About 1:00 p.m. on November 25, WWPD notified Brown that they had located defendants in room 328 of the Capri Motel in Walla Walla. They had registered there under the ficticious name of Allen Schwigger with an address of, "West 24th, New York City." Rector's white Buick, Oregon license CKP 524, was found in the motel parking lot. Brown called Umatilla County District Attorney Gallaher for advice.

---

[2]

"Christopher Irving Rector, 37, DOB 4-20-45' 10", 150 lbs., brown hair, blue eyes, medium build, medium complexion;

"Ronald David Tremaine, 44, DOB 5-17-38, 6' 3", 265 lbs., silver-gray hair, brown eyes, large build and medium complexion."

Brown also obtained physical descriptions of defendants from a police computer:

"Tremaine, 6' 3", 300 lbs., gray hair, green eyes, DOB 8/1/44; Rector 5' 10", 150 lbs., brown hair, blue eyes, DOB 4/20/46."

They decided that Brown should take Veitenheimer to Walla Walla to see if he could identify Rector or Tremaine.

Meanwhile, WWPD officer Wright continued surveillance at the motel. He saw a large, white male, later identified as Tremaine, enter Rector's Buick and drive away. He notified other WWPD officers and followed in a marked police car. Tremaine saw him, and Wright radioed to the other officers that he had been observed. The Buick traveled a short distance and stopped at a cycle shop. Tremaine went inside the shop. While there, he appeared to be looking out the front window. WWPD officers Allessio and Stroe heard Wright's radio report that Tremaine was in the cycle shop looking out the window. They knew that Tremaine was a felon, possibly armed, and they were concerned about the safety of people in and about the cycle shop. They also knew that Tremaine had had time to telephone Rector, who had remained behind at the Capri Motel.

About 15 minutes later, Tremaine returned to the Buick and drove about two blocks. Allessio and Stroe followed him in one car. WWPD Officer Cyr followed in a second car. Allessio then heard a radio report from WWPD Officer Pearson that curtains in room 328 had moved, as though someone were looking out. He was concerned that Tremaine had alerted Rector. When Rector's Buick stopped at an intersection, Allessio observed that Tremaine matched the description of one of the robbers given by the MFPD. The officers signaled Tremaine to stop, and he did. Allessio noticed that Tremaine's face appeared to be raw, as if he had recently shaved. The officers arrested him and searched the Buick for weapons and, although finding none, impounded it. The officers then drove to the motel. Allessio ordered Rector to come out of room 328. When he did, they arrested him and removed $1,900 from his person. They searched him and room 328 for weapons, but found none. About fifteen minutes later, Brown and Veitenheimer arrived. Veitenheimer identified Tremaine as one of the robbers and identified Rector as possibly the other robber.

Shortly after defendants' arrests, WWPD detective Kyle prepared an affidavit in support of an application for a warrant to search room 328 and Rector's Buick. Kyle had not been involved in defendants' arrests, and he obtained his

information from police sources. His affidavit contained some inaccuracies. A Washington judge issued a warrant authorizing the searches. Kyle, Brown and Allessio searched room 328. Kyle testified that he saw a green bank bag and several quarter wrappers there. Other officers searched the Buick. Nothing was seized during either search.

On November 28, officer Rogers of the Baker Police Department (BPD) and Brown went to Walla Walla. Rogers had been investigating a burglary at the Baker Bowl on November 17, 1983, in which about $2,000 in quarters had been stolen. He had heard about defendants' attempts to exchange quarters for paper money. Rogers and Brown met Kyle as he was unloading defendants' property, which had been removed from the motel after Rector had requested his clothing. The WWPD officers removed all of defendants' property and placed it in a police storage area, where all prisoners' property is held. Rogers and Brown assisted Kyle in unloading defendants' property. While doing so, they saw two new bowling bags. Rogers thought that the sole of a pair of tennis shoes found among defendants' property matched a footprint that he had found outside the Baker Bowl. Kyle then applied for a second warrant authorizing a search of defendants' property and a second search of Rector's Buick. His affidavit included information about the Baker Bowl burglary and the discovery of the bowling bags, as well as information about defendants' arrests, the previous searches, the information given by Morris and May and defendants' criminal records. The second search warrant was issued November 29. Pursuant thereto, WWPD officers seized four bowling bags, a black bag, three pry bars and two screwdrivers.

Marvin and Helen Foster own the Western Motel in Baker, about two blocks from the Baker Bowl. On November 29, BPD officer Rubin showed them pictures of Rector and Tremaine and asked if they recognized either man. Mr. Foster said that the two men had stayed at the motel for two nights about 10 to 14 days earlier. He described one of the men as being quite a bit taller than the other, about 6'4" or 6'5", with white hair and weighing over 200 lbs. He described the other man as being more average looking, 5'11" to 6' tall, weighing 180-200 lbs, fairly well-built and having brown hair. He felt that he could identify the taller, bigger man but was not sure about the smaller man. Mrs. Foster recognized the men, but

she was not sure that they had stayed at the motel. The Fosters stated that the registration slip filled out by one of the men had been lost.

The trial court denied defendants' motions to suppress the evidence seized during execution of the second search warrant and the Fosters' identifications. After a trial to the court on stipulated facts, defendants were convicted of the burglary of the Baker Bowl.

Defendants first contend that the trial court erred in denying their joint motion to suppress evidence "based on warrantless and unlawful arrest not supported by probable cause." They argue that the witnesses' descriptions of the two men attempting to exchange the quarters and of the market robbers did not match them, that the brown Ford LTD seen at the market was not theirs and, therefore, that the Walla Walla police did not have reason to believe that they had been in Milton-Freewater on November 23.

The parties argue about whether Washington or Oregon law applies in determining the validity of the arrests. Defendants argue that Oregon law applies, because they were arrested on the basis of information provided by Oregon authorities and they were prosecuted and convicted in Oregon.[3] The state argues that Washington law applies, because defendants were arrested in Washington by Washington police and the arrests were not made at the request of Oregon authorities.

■ We are not persuaded that the analysis of the validity of the arrests in this case would be any different under Oregon or Washington law.[4] Defendants have not called our attention

---

[3] Defendants rely on *State v. LeMay,* 27 Or App 447, 556 P2d 688 (1976). That case is distinguishable. It involved an arrest in Canada by Canadian authorities at the request of Oregon police. This court indicated that there was some authority for applying federal constitutional law to searches and seizures performed by foreign officials at the request of American authorities. *LeMay* involved a question of international conflict of laws and whether the Fourth Amendment applied. This case involves an interstate conflict of laws question and the issue of whether state officers have authority to make a warrantless arrest within their own jurisdictions.

[4] Generally, the law of the state in which a warrantless arrest is made determines the validity of the arrest. *See Miller v. United States,* 357 US 301, 306, 78 S Ct 1190, 2 L Ed 2d 1332 (1958); *United States v. Di Re,* 332 US 581, 589-90, 68 S Ct 222, 92 L Ed 210 (1948); *State v. Cooper,* 223 Kan 175, 176, 573 P2d 1006 (1977); *State v. Coleman,* 177 Mont 1, 18, 579 P2d 732 (1978), *cert den* 446 US 970 (1980); *Menefee v. State,* 640 P2d 1381, 1384 (Okla 1982); *Six Feathers v. State,* 611 P2d 857, 861 (Wyo 1980).

to any material difference in the law of arrest in the two states. Like that of Oregon,[5] Washington law permits warrantless arrests based on probable cause.[6] Both states permit officers acting in concert to rely upon their shared knowledge in assessing probable cause.[7] Under Washington law, probable cause to arrest exists where the facts and circumstances within the arresting officer's knowledge and of which the officer has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in a belief that an offense has been or is being committed and that the person to be arrested committed the offense. *See Bender v. Seattle,* 99 Wash 2d 582, 597, 664 P2d 492 (1983). In Oregon, probable cause means that there is a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it. ORS 131.005(11).

■    When they arrested defendants, WWPD officers knew: (1) an armed robbery had been commited in Milton-Freewater on November 23, by two white adult men whose descriptions generally matched defendants; (2) a person resembling Tremaine was in Milton-Freewater on the afternoon of November 23; (3) defendants were crime partners with records for burglary and theft; (4) defendants' *modus operandi* was to stay at a motel near the place which they intended to target; (5) defendants were registered under a ficticious name in a motel in Walla Walla, about ten miles from Milton-Freewater; (6) Rector's Buick was in Milton-Freewater on the afternoon of November 23; on November 25, it was seen at the Walla Walla motel where defendants were staying; the person resembling Tremaine was driving the Buick in Walla Walla on November 25; (7) on November 23,

---

[5] ORS 133.310(1) provides, in part:

"A peace officer may arrest a person without a warrant if the officer has probable cause to believe that the person has committed * * *

"(a) A felony."

[6] Wash Rev Code § 10.13.100 provides, in part:

"A police officer having probable cause to believe that a person has committed or is committing a felony shall have the authority to arrest the person without a warrant."

[7] *See State v. Groda,* 285 Or 321, 591 P2d 1354 (1979); *State v. Mickelson,* 18 Or App 647, 650, 526 P2d 583, *rev den* (1974); *State v. Gluck,* 83 Wash 2d 424, 426-27, 518 P2d 703 (1974); *State v. Maesse,* 29 Wash App 2d 642, 647-48, 629 P2d 1349 (1981).

May saw a white male adult in his 30's, 5'9" tall with that person in the First Interstate Bank in Walla Walla; (8) on November 23, Morris saw a white male adult in his 30's with that person in the Milton-Freewater Bank; they left the bank in Rector's Buick; and (9) the second robber was described as being a white male. We agree with the trial court's conclusion that "the totality of the facts and circumstances" show that the WWPD "officers had probable cause to arrest both defendants without a warrant * * *."

■ Defendants next contend that the trial court erred in denying their joint motion to suppress evidence "as a result of defendants' motion to contest good faith, accuracy and truthfulness of affidavit for search warrant." We analyze this assignment under Washington law because the affidavits were made in Washington by a Washington police officer and the warrants were issued by Washington judges.

The Washington Supreme Court has stated:

> "To establish probable cause the affidavit must set forth sufficient facts to lead a reasonable person to conclude there is a probability that the defendant is involved in criminal activity. *State v. Seagull*, 95 Wash. 2d 898, 906, 632 P.2d 44 (1981); *State v. Henker*, 50 Wash. 2d 809, 811, 314 P.2d 645 (1957)." *State v. Cord*, 103 Wash 2d 361, 365, 693 P2d 81 (1985).

In Washington, as in Oregon, a determination of probable cause to issue a search warrant made by an issuing magistrate is given deference by the reviewing court. *State v. Seagull*, *supra*, 95 Wash 2d at 907; *see also State v. Patterson*, 83 Wash 2d 49, 515 P2d 496 (1973).

Unlike Oregon,[8] Washington does not have a statutory procedure for challenging the sufficiency of an affidavit. Washington courts have relied on the test established by the United States Supreme Court in *Franks v. Delaware*, 438 US 154, 98 S Ct 2674, 57 L Ed 2d 667 (1978). *See State v. Seagull*, *supra*. *Franks* held:

> "[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false

---

[8] *See* ORS 133.693.

statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." 438 US at 155.

■    The trial court found that the affidavit for the first search warrant contained a number of "mistakes or discrepancies." It found mistakes in the physical descriptions of both suspects, in the statement that both suspects went in the Milton-Freewater bank to cash a check (when in fact only Tremaine went in that bank and his purpose was to exchange quarters) and in the statement that Rector drove the Buick (when in fact it was Tremaine). However, the court concluded that those mistakes or discrepancies were not recklessly or intentionally made. We agree. The trial court did not err in failing to suppress the evidence based on the first affidavit.

The trial court also found that the affidavit for the second search warrant contained some discrepancies and that Kyle had recklessly and erroneously stated that the search at the Capri Motel had revealed a green money bag. After striking the erroneous material, the court concluded that there were still sufficient facts in the affidavit for a "reasonable and disinterested person to believe that contraband [sic] may exist and that requested searches [of defendants' property and Rector's Buick] would produce evidence of the contraband."[9] Again, we agree. After the erroneous material was stricken, there were still sufficient facts remaining in the second affidavit for a person of reasonable caution to conclude that defendants had been involved in criminal activity and that evidence of that activity would probably be found among their property and in Rector's Buick. The trial court did not err in failing to suppress the evidence based on the second affidavit.

Finally, defendants contend that the trial court erred

---

[9] Defendant does not challenge the trial court's use of the word "contraband."

in "denying defendants' joint motion to suppress identifications." They argue that the procedures used by the Baker police in obtaining the identifications from the Fosters were unnecessarily suggestive, because they were shown only pictures of defendants. *See Manson v. Brathwaite,* 432 US 98, 97 S Ct 2243, 53 L Ed 2d 140 (1977). The state argues that the identification procedure was not impermissibly suggestive, because Rubin did not ask the Fosters to identify defendant in reference to a crime; he merely asked the Fosters if they recognized either man.

In *State v. Classen,* 285 Or 221, 590 P2d 1198 (1979), the Supreme Court set out a two-part test to be used in determining the admissibility of identification evidence. First, the court must determine "whether the process leading to the offered identification was suggestive or needlessly departed from the procedures prescribed to avoid such suggestiveness." 285 Or at 232 (footnote omitted). If so, then the court must determine whether, despite any suggestiveness, other aspects of the identification exclude the risk that it resulted from the suggestive procedure. 285 Or at 232. The determination whether there was undue suggestiveness is a question of law. *State v. Nation,* 54 Or App 929, 934, 636 P2d 1001 (1981), *rev den* 292 Or 568 (1982).

■ This court has held that, "[f]or a [photo] display to be impermissibly suggestive it must somehow lead the witness to identify the person on some basis other than the witness' memory." *State v. Maher,* 72 Or App 543, 546, 696 P2d 573, *rev den* 299 Or 314 (1985). An identification is unduly suggestive if it unfairly singles out or points to a defendant as the suspect to be identified for a known crime or for a known reason. *See, e.g., State v. Classen, supra; State v. Bush,* 29 Or App 315, 563 P2d 747 (1977); *State v. McBain,* 24 Or App 737, 547 P2d 188, *rev den* (1976).

■ When they were asked if they had seen either of the men in the photographs, the Fosters were not told that a crime had been committed. Nothing in the identification procedure indicated that defendants were suspects to be identified for a known crime or for a known reason. Moreover, the Fosters were not being talked to as witnesses to a crime. The trial court did not err in failing to suppress the Fosters' identifications. *See State v. Classen, supra.*

Affirmed.